## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

I, Edwin G Parrott, being duly sworn, depose and state that:

### INTRODUCTION

1. I make this continuation of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – cellular telephones, as described in Attachment A – that is currently in the possession of law enforcement, and the extraction of electronically stored information from that property as described in Attachment B.

2. I am a Task Force Officer with the United States Drug Enforcement Administration, United States Department of Justice, and have been so since March 2020. I am currently assigned to the Grand Rapids District Office in the DEA's Detroit Field Division. I have been a police officer with the Lansing Police Department for approximately 20 years, 3 of which I was assigned as an investigator with the Lansing Police Special Operations Section (SOS), which is tasked with investigating narcotics trafficking. During my time as a SOS Investigator, I have participated in investigations of unlawful drug trafficking and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and also made several narcotic purchases in an undercover role. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded

language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b), conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C.§ 1957.

3. Since spring 2020, agents and officers from the DEA Lansing, LPD SOS, MSP TCM, and HSI have been conducting a joint investigation into the drug trafficking activities of the WASHINGTON Drug Trafficking Organization ("WASHINGTON DTO"), headed by EDWARD WASHINGTON. The investigation has revealed that the WASHINGTON DTO, located in Lansing, Michigan, is distributing bulk quantities of fentanyl, cocaine, and heroin throughout Lansing, Michigan.

4. During the course of the investigation, investigators obtained authorization to intercept the wire communications over LATISHA MACK's cellular phone (Target Phone 1) on April 14, 2021, DEMANUEL PORTER's cellular phone (Target Phone 2) on April 14, 2021 (as well as electronic communications for this phone during this first 30-day period) and May 21, 2021, EDWARD WASHINGTON's cellular phone (Target Phone 3) on May 21, 2021 and June 17,

2021 and EDWARD WASHINGTON's cellular phone (Target Phone 4) on June 17, 2021. During the interception of these Target phones, investigators intercepted and monitored phone calls between EDWARD WASHINGTON, DEMANUEL PORTER, JAMAR STREET, LATISHA MACK, MICHAEL TERRY, ANGELA DORITY, EBONY MALONE and JEROME TILL which were associated with narcotics trafficking.

5. During the course of that investigation, investigators learned that ANGELA DORITY and LATISHA MACK transport fentanyl on behalf of EDWARD WASHINGTON. Investigators also learned that DEMANUEL PORTER, JAMAR STREET, MICHAEL TERRY, and JEROME TILL distribute narcotics, namely fentanyl supplied by EDWARD WASHINGTON.

6. On July 30, 2021, the Honorable Judge Sally J. Berens signed arrest warrants for EDWARD WASHINGTON, EBONY MALONE, ANGELA DORITY, LATISHA MACK, DEMANUEL PORTER, JAMAR STREET, MICHAEL TERRY and JEROME TILL. Judge Berens also authorized search warrants for DEMANUEL PORTER's, EDWARD WASHINGTON's, ANGELA DORITY's, EBONY MALONE's and AT's (EDWARD WASHINGTON's mother) residences.

7. Collectively, EDWARD WASHINGTON, EBONY MALONE, ANGELA DORITY, LATISHA MACK, DEMANUEL PORTER, JAMAR STREET, MICHAEL TERRY and JEROME TILL shall be referred to as the Defendants. The statements contained in this continuation are based in part on: (a) my personal participation in this investigation; (b) information provided by other federal law enforcement

officers, Lansing Police Department Detectives and the Michigan State Police Tri-County Metro Narcotics Detectives; (c) review of consensually recorded conversations and conversations intercepted pursuant to court orders authorizing the interception of wire and electronic communications; (d) laboratory analysis reports; (e) surveillance reports; (f) criminal history records; (g) information from confidential informants; and (h) my training and experience and the training and experience of other law enforcement agents. This continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.   This continuation supports the application of the warrants to search the property currently in the possession of law enforcement, hereinafter collectively referred to as "**Device 1, Device 2, Device 3, Device 4, Device 5, Device 6, Device 7, Device 8, Device 9, Device 10, and Device 11**" or "the **Devices**":

- **Device 1** – Silver iPhone with a brown case, located on top of MALONE's dresser at 4011 Woodcreek Lane, Lansing, Michigan.

- **Device 2** – Black iPhone in a gold case, located in the master bedroom at 3941 Glenburne Avenue, Lansing, Michigan

- **Device 3** – Black Samsung, located in the master bedroom at 3941 Glenburne Avenue, Lansing, Michigan.

- **Device 4** – Black REVVYL cellular phone, located in the master bedroom at 3941 Glenburne Avenue, Lansing, Michigan.

- **Device 5** – Silver LG cellular phone, located inside GMC Terrain registered to JAMAR STREET at 2700 Eaton Rapids Road Lot 153, Lansing, Michigan.

- **Device 6** – iPhone with white case, located in the living room at 2700 Eaton Rapids Road Lot 153, Lansing, Michigan.

- **Device 7** – iPhone with white case, located in the front bedroom at 2700 Eaton Rapids Road Lot 153, Lansing, Michigan.

- **Device 8** – Red iPhone, located in EDWARD WASHINGTON's bedroom at 3427 Maybel, Lansing, Michigan.

- **Device 9** – Black cellular phone, located on JEROME TILL during his arrest in Lansing, Michigan.

- **Device 10** – LG cellular phone, located on JEROME TILL during his arrest in Lansing, Michigan.

- **Device 11** – Silver iPhone, located on ANGELA DORITY during DORITY's arrest on June 19, 2021 by Ingham County Sheriff's Department for Possession with Intent to Deliver Fentanyl.

9. The **Devices** are currently located at the DEA Grand Rapids District Office. The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B. Based on my training and experience, I know that the

**Devices** have been stored in a manner such that they are in the same condition as when they were seized on August 3, 2021 and June 19, 2021.

10. Based on the below, I submit there is probable cause to believe that the Defendants conspired to distribute and to possess with intent to distribute methamphetamine and fentanyl in violation of 21 U.S.C. § 846, 841(a)(1), and used communication facilities in furtherance of drug trafficking crimes in violation of 21 U.S.C. § 843(b). Further, I submit there is probable cause to believe that evidence, as described in attachment B, will be found on the **Devices**, as further described in Attachment A.

## PROBABLE CAUSE

11. On August 3, 2021, investigators executed federal search warrants and federal arrest warrants throughout greater Lansing, Michigan targeting the WASHINGTON DTO and the HUMPHREY DTO. During the execution of warrants, investigators seized Target Phones. Investigators executed the search warrants and arrest warrants after Chief Judge Robert J. Jonker authorized wire interceptions over five different target phones, including Target Phone 1, which was used by LATISHA MACK, Target Phone 2, which was used by DEMANUEL PORTER, and Target Phones 3 and 4, which was used by EDWARD WASHINGTON.

12. As detailed in the continuation of criminal complaint that I swore to in *United States v. Washington et al.*, 1:21-mj-401, this investigation involved the Defendants conspiring to distribute and possess with intent to distribute fentanyl, as well as the use of communication facilities (cell phones) to facilitate drug

trafficking. I incorporate and re-adopt that continuation as though fully set forth herein. Further, I attach a copy for the Court's review as government exhibit A.

13. During the arrest of Ebony MALONE at 4011 Woodcreek Lane, Lansing, Michigan, investigators conducted a search of the residence. Investigators located **Device 1** on top of MALONE's bedroom dresser. Investigators also located suspected heroin in MALONE's bedroom dresser and a firearm behind MALONE's bed frame.

14. During the arrest of Demanuel PORTER at 3941 Glenburne Avenue, Lansing, Michigan, investigators conducted a search of the residence he shared with T.H. Investigators located **Device 2, Device 3, and Device 4** in the master bedroom, which PORTER and T.H. shared. Also located in the kitchen cabinet was approximately 43 gross grams of suspected cocaine.

15. During the arrest of Jamar STREET at 2700 Eaton Rapids Road Lot 153, Lansing, Michigan, investigators collected the **Device 5** from within Jamar STREET's 2018 GMC Terrain, registered to Jamar STREET on the premises. Further, investigators collected **Device 6** from within the living room and **Device 7** from the front bedroom, which investigators believe belongs to STREET based on STREET's father's bedroom being the other and the master bedroom. Also located at the subject premises was 60 hydrocodone pills, 2 blenders and a Pyrex measuring cup with suspected narcotics residue, and a firearm.

16. During the arrest of Edward WASHINGTON at 3427 Maybel Street, Lansing, Michigan, investigators collected **Device 8** from Edward WASHINGTON's

bedroom under the nightstand. An occupant identified that room as WASHINGTON's and said no one else was staying there. Investigators also located in the bedroom approximately $14,000 US currency.

17. During the arrest of JEROME TILL, investigators collected **Device 9** and **Device 10** from JEROME TILL's person.

18. During the arrest of ANGELA DORITY on June 19, 2021 by Ingham County Sheriff's Office (ICSO), ICSO deputies collected **Device 11**. DORITY and a minor individual were the only occupants in the car. **Device 11** was the only phone found in the car. Also located during DORITY's arrest was approximately 498 grams Fentanyl.

19. Further, based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

      a. Drug traffickers often use multiple phones and switch up "burner" phones to avoid detection by law enforcement;

      b. Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices;

      c. Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices;

    b.    Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices;

    c.    That drug traffickers often maintain, on hand, large amounts of currency in order to maintain and finance their on-going narcotics business;

    d.    Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking;

    e.    User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation;

    f.    Drug traffickers often use the internet to look up various information to support their drug trafficking activities;

    g.    That drug traffickers often have unexplained wealth and assets as they do not have a job, nor do they report income on their state or federal tax returns. Subjects often use cash, money orders, and cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming from. Subjects will place assets in the names of nominees, which

        are often friends and family members in an attempt to hide the true ownership of the assets. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including their devices;

h. That it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds. This evidence includes currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box receipts or keys, records concerning storage lockers and money wrappers. These and other items are maintained by the drug traffickers within their residences, businesses, or other locations over which they maintain dominion and control.

i. That when drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency.

j. That the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money").

k. That it is common for drug traffickers to separate their "street money" by denomination and organize this currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting.

l. That the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions.

  m. That drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. The "source" of their income reported on tax returns can be falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses.

  n. That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances.

  o. That drug traffickers frequently receive their supply of drugs through packages sent by U.S. Mail or third-party delivery service.

## TECHNICAL TERMS

20. Based on my training and experience, I use the following technical terms to convey the following meanings:

  a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log,"

       which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

    c.      Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

    d.      GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using

specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the

structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

21. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the **Devices** have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

22. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

23. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Devices** were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Devices** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

24. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

25. *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

26. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Devices** described in Attachment A to seek the items described in Attachment B.